UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NANCY POUX, *as Administrator of
the Estate of Raymond Rivera*,

                        Plaintiff,

        – against –

CITY OF NEW YORK, AYOUBA
DOUMBIA, *and* JOHN and JANE DOES
1-7,

                        Defendants.

**OPINION & ORDER**

22-cv-9368 (ER)

RAMOS, D.J.:

    Nancy Poux, as administrator of the estate of Raymond Rivera, brings this suit

against the City of New York, New York City Department of Corrections data analyst

Ayouba Doumbia, and Does 1–7.  Poux principally alleges that Rivera was unlawfully

over-detained until the day of his death, in violation of the Fourth, Eighth, and Fourteenth

Amendments of the United States Constitution, and falsely imprisoned in violation of

state law.  Doc. 32. ¶¶ 119–153.  Before the Court is the City of New York and Ayouba

Doumbia's motion for summary judgment on all claims.  For the reasons set forth below,

the motion is granted.

## I.    BACKGROUND

### A.  Factual Background[1]

#### 1.  Rivera's Arrest and Final Revocation Hearing

In the summer of 2019, Raymond Rivera was on parole under the supervision of the New York State Department of Corrections and Community Service ("State DOCCS").  Doc. 124 ¶ 2.  On July 2, 2019, Rivera was arrested for stealing from a Family Dollar store and charged with petit larceny and criminal possession of stolen goods.  Doc. 124 ¶ 1; Doc. 123-2 at 2.  The Queens Criminal Court released Rivera on his own recognizance, Doc. 124 ¶ 3, and according to the State DOCCS Community Supervision Chrono Report ("DOCCS Chrono Report"), Rivera was subsequently admitted to Cornerstone, an in-patient substance abuse rehabilitation facility.  Doc. 123-4 at 10.  A State DOCCS report, submitted by Senior Parole Officer Ana Russell, noted that on July 19, 2019, Rivera left rehab at Cornerstone, changed his approved residence without the knowledge or permission of his Parole Officer, Imma Nwakanma, and failed to report to Nwakanma within 24 hours of leaving rehab, as he was directed.  Doc. 123-2 at 2.  On August 9, 2019, Russell recommended that Rivera be declared delinquent and to have absconded.  *Id*.

State DOCCS issued a parole warrant for Rivera's arrest on August 12, 2019, Doc. 112 ¶ 7.  Rivera was subsequently arrested and sent to a jail on Rikers Island, which is operated by the New York City Department of Corrections ("NYC DOC").  Doc. 124 ¶ 5–6.

---

[1] The following facts are drawn from the parties' Rule 56.1 statements, Docs. 112, 124, 125, and 132, supporting exhibits, and pleadings.  The facts are undisputed unless otherwise noted.

Rivera's final revocation hearing was initially scheduled for August 29, 2019;[2] however, the hearing was adjourned several times and was ultimately held on February 27, 2020.[3] Docs. 112 ¶¶ 15–16. The hearing was conducted before Administrative Law Judge ("ALJ") Anthony Zrake. Doc. 114-7 at 3. At the hearing, Rivera pleaded guilty to violating a term of his parole and the parties jointly recommended that Rivera be "revoked and restored" to parole supervision in the community, and to participate in outpatient mental health and substance abuse treatment. Docs. 124 ¶ 10; 114-2 at 4. At the conclusion of the hearing, ALJ Zrake detailed the terms of Rivera's supervision, and stated, "you'll have a written decision shortly, Mr. Rivera."[4] Doc. 114-7 at 8. While the hearing was held at the Rikers Island Judicial Center, no NYC DOC employees participated in the hearing. Docs. 114-7 at 3, 112 ¶ 18. The only people present at the final revocation hearing were ALJ Zrake, Rivera, Rivera's counsel, State DOCCS Parole Revocation Specialist Shanavia Dandridge, and a court reporter. Doc. 114-7 at 3.

In a memorandum dated February 27, 2020, Parole Revocation Specialist Shanavia Dandridge wrote that Rivera's final revocation hearing had been held, and that the outcome was "Violation Sustained; Hearing Completed" and "R&R."[5] Doc. 124 ¶

---

[2] According to the DOCCS Chrono Report, Rivera "exercised his rights to waive the preliminary hearing, and go straight to the final hearing." Doc. 123-4 at 8.

[3] On February 24, 2020, prior to the final hearing, Rivera pleaded guilty to disorderly conduct in connection with the Family Dollar store theft and was sentenced to time served. Doc. 124 ¶ 8.

[4] According the transcript, ALJ Zrake stated, "[o]kay. So it would be a revoke and restore. You need to report back to parole within 24 hours if you're released here. You will attend and go to your mandated programs. . . . So you–you'll have a written decision shortly, Mr. Rivera. Good luck." Doc. 114-7 at 8.

[5] In filling out the memorandum on the outcome of the hearing, Parole Revocation Specialist Dandridge checked a box for "Violation Sustained; Hearing Completed" and handwrote "R&R" beside it. Doc. 114-6 at 6. In his deposition, NYC DOC Captain Anthony Monastero indicated that "R&R" stands for "[r]evoke and restore to community supervision." Doc. 123-8 at 11.

16; Doc. 114-6 at 6.  The memorandum is addressed to NYC DOC and NYC DOC is also listed on the distribution list.  *Id.*

In her deposition as an organizational representative of State DOCCS, State DOCCS bureau chief Leleith Shaw noted that copies of this type of memorandum are left with NYC DOC staff at the judicial center's general office for distribution.[6]  Doc. 123-9 at 10 (confirming that that NYC DOC staff are "notified [of the findings] every time we have a . . . final revocation hearing.").  In his deposition, NYC DOC Captain Anthony Monastero, supervisor of New York City's Office of Custody Management, confirmed that such a memorandum would have been "returned to the general office at [Rivera's prison housing facility]," but also noted that the City's information system would not be updated at that time, because, "as far as the [NYC DOC] is concerned, the [State DOCCS] warrant is still active." [7]  Doc. 123-8 at 4, 10–11.  In other words, absent further

---

[6] Shaw was not assigned to Rikers Island in 2020 and so she testified about her experiences in 2017, when she was assigned deputy chief to the Rikers Island jail.  Doc. 123-9 at 10.

[7] Captain Monastero testified as follows:

> Q:    So after this hearing Mr. Rivera would have been -- according to your testimony, if the procedures were followed – [Rivera] would have been returned to [his housing facility] with a copy of this memo, correct?
> A:    Yes.
> Q:    With accompanying card, correct?
> A:    Yes.
> Q:    And with a copy of  his warrant, correct?
> A:    Yes.
> Q:    And all of those documents would have been returned to the general office at [Rivera's housing facility], right?
> A:    Correct.
> Q:    And the officer at [Rivera's housing facility] would do what with all of this information?
> A:    Compile it and put it back in the legal folder.  If there was information to be updated, the officer in the general office will update the [Inmate Information System] with any updates on the case.
> Q:    What update would have been -- would be made into the [Inmate Information System] when somebody has their final hearing and issued the revoke and restore?
> A:    Nothing would be updated because the warrant -- as far as the New York City Department of Corrections is concerned, the warrant is still active.

affirmative action by State DOCCS immediately following the final parole revocation

hearing, Rivera's parole warrant continued to be active and he continued to be detained.

    2.   *ALJ Zrake's Parole Revocation Decision Notice and State DOCCS's Failure to Notify NYC DOC*

ALJ Zrake issued his decision the day after the final hearing, February 28, 2020.

Doc. 112 ¶ 19.  ALJ Zrake noted that Rivera pleaded guilty to a violation of parole and

accepted the parties' joint recommendation that he be restored to parole supervision while

attending outpatient substance abuse treatment.[8]  *Id*.  ALJ Zrake wrote, "th[e] court finds

that Mr. Rivera did violate a condition of his release in an important respect, and hereby

imposes a sentence of Revoke & Restore (prior residence; Vertex outpatient for substance

abuse and mental health)."  Docs. 112 ¶ 20; 114-2 at 4.

Also on February 28, 2020, ALJ Zrake distributed a copy of the decision to

several State DOCCS employees, including senior parole officer Antoinette Douglas, via

email.  Doc. 124 ¶ 19, 22.  However, despite receiving the email, P.O. Douglas failed to

provide Rivera's field parole officer with a copy of ALJ Zrake's decision, as required by

State DOCCS procedure.  Doc. 111-10 at 3.  According to a 2021 investigative report

prepared by the State DOCCS's Office of Special Investigations, based on Douglas' own

admission, she "missed that email."  *Id*.  Because Douglas failed to act, the standard

process of preparing Rivera for a release interview, transmitting a "warrant lift

---

Doc. 123-8 at 10-11.

[8] In the decision, ALJ Zrake noted, "Mr. River has accepted responsibility by pleading guilty here; he has been lodged over 6 months already; and [ ] there is a joint recommendation between the parties.  Mr. Rivera's program needs can be appropriately addressed in the community with parole supervision; restoration to supervision will not have an adverse effect on public safety or public confidence in the integrity of the criminal justice system."  Doc. 123-6 at 4.

authorization" to NYC DOC, and ultimately releasing Rivera did not occur.  Doc. 123-13

8–11.[9]  If proper procedures had been followed, Rivera would have been released on

March 3, 2020.  *See id.*[10]

> 3.  *Rivera's Continued Detention on Rikers Island*

Rivera's DOCCS Chrono Report indicates that on March 9, 2020, State DOCCS

Parole Officer Imma Nwakanma discovered that Rivera had been reassigned to her and

searched the NYC DOC's "inmate lookup system" for Rivera but found no record of

him.[11]  Doc. 123-4 at 3.  After subsequent unsuccessful attempts to locate Rivera using

the NYC DOC lookup system, Nwakanma contacted Rivera's housing facility on Rikers

Island by phone on March 11, 2020, eight days after he was to have been released.  Doc.

---

[9] In her deposition, Douglas testified to the procedure that is generally followed upon receiving an ALJ's parole revocation decision restoring an individual to community supervision.  Doc. 123-13 9–11.  First, upon receiving the ALJ decision, she, or one of her aides, would provide a parole officer with the ALJ's decision and all supporting documents "for preparation for [a] release interview and warrant lift" and ultimately the release of the detainee to parole supervision.  Doc. 123-13 at 9–10.  The detained individual would be added to a "production list" for three days in the future.  *Id.*  On the date of their "production," a State DOCCS parole officer would conduct a release interview, and ultimately the individual would be released from detention.  *Id.* at 10–11.  At the end of this process, a State DOCCS parole officer would provide paperwork, including the warrant lift authorization, to the NYC DOC-run general office in the judicial center.  *Id.*

[10] In 2020, the time between receipt of the ALJ decision and the release of the detained person would have taken between two and three days.  Doc. 123-13 at 9–11.  Douglas testified:  "Back then in 2020 we were working kind of with a three-day turnaround, so if you got a decision on a Monday . . . before 2 o'clock in the afternoon, then that person would be added to Wednesday's production list.  If you got it on Tuesday, it went to Thursday's production list . . . So on and so forth, like that."  *Id.*  As ALJ Zrake's decision was emailed to Douglas 11:50 am on Friday February 28, 2020, Doc. 123-10 at 2, Rivera should have been added to the production list for Tuesday, March 3, 2020.

[11] Rivera's DOCCS Chrono Report has an entry on March 2, 2020, that in part, reads:  "parole jail time certificate produced for warrant #0793926.  [S]tart date = 08/19/2019, end date = 02/27/2020, total days = 00193."  Doc. 123-4 at 3.  An entry with the same excerpted text also appears on March 6, 2020.  *Id.*

123-4 at 2–3.  During that call, a NYC DOC employee verified that Rivera was still being detained on Rikers Island.[12]  *Id.*

On March 19, 2020, Rivera made a 311 complaint to the NYC DOC's Office of Constituent and Grievance Services ("OCGS"), "reporting that he was to be released since 10 days ago but he is still in jail."  Docs. 124 ¶ 31, 123-15 at 2.  OCGS corrections officer Woo Ho received Rivera's complaint and testified that he provided Rivera's complaint to OCGS data analyst, defendant Ayouba Doumbia, as was customary for all jail-release complaints.  Docs. 112 ¶ 24; Doc. 114-9 at 53.[13]  NYC DOC's electronic records indicate that at 2:47 pm on March 19, 2020, Ho noted that Rivera's"[p]arole information [was] provided to Mr. Ayouba [Doumbia]."  Docs. 124 ¶ 34; 123-15 at 5.

However, in his deposition, Doumbia testified that he never received Rivera's complaint from Ho.  Doc. 112 ¶ 25.  Doumbia believes he was not in the office on March 19, 2020, the day that Ho stated he provided Doumbia with Rivera's complaint, as that was the day that Doumbia had to "go out for COVID."  *Id*.

Ordinarily, Doumbia compiled complaints he received concerning the over-detention of individuals on parole into a report and sent that report to the State DOCCS at

---

[12] Specifically, Nwakanma's record in Rivera's DOCCS Chrono Report indicates that a NYC DOC employee stated that, "[the NYC DOC employee] does not control the computer system.  However, that [Rivera] is there."  Doc. 124 ¶ 30.  Doc. 123-4 at 2.

[13] Ho testified that customarily, he would either hand the relevant materials to Doumbia directly, or if Doumbia was not present, Ho would put the materials on Doumbia's desk.  Docs. 112 ¶ 24; 123-16 at 53–54.

With respect to Rivera's complaint, Ho testified that he personally handed it to Doumbia:

> Q:    So in this case you told me earlier that you printed [Rivera's complaint] and you handed it to Mr. Ayouba [Doumbia]?
> A:    Yes.

Doc. 114-9 at 53.

the end of each week.[14]  Doc. 112 ¶ 26.  However, Doumbia did not send a report to the

State DOCCS the week of Rivera's complaint.  Doc. 112. ¶ 27.

Regardless, Doumbia did not compile or send another report of over-detention

complaints until sometime in April 2020, when he received a NYC DOC computer

allowing him to work from home.[15]  Doc. 123-17 at 13–14.  Doumbia testified that he

expected that other NYC DOC "uniformed staff," who continued to work in-person,

would have ensured that all work would continue without interruption.[16]  *Id.* at 17–18.

---

[14] In his deposition, Doumbia testified that while he was expected to send out the weekly report, his supervisor was ultimately responsible:

> Q:    What was the system for making sure that every Friday the list went out to these people that included all the complaints of the week?
> A:    Well, that will be the supervisor to make sure that the report goes out.
> Q:    Okay.
> A:    That's all, yes.  That's all I can say about that.
> Q:    But did you every week send it out?
> A:    Most of the time, yes.
> Q:    Did every week your supervisor say to you, Mr. Doumbia, send the report to the individuals about the --
> A:    [Doumbia's supervisor] will not say, but if it's not sent, she will know that it's not sent.
>
>                              . . .
>
> Q:    The expectation was that you were the person who each week would send that report out, is that –
> A:    Yes.
> Q:    Fair to say?
> A:    Yes.

Doc. 123-17 at 8.

[15] In his deposition, Doumbia testified that after being sent home during the initial days of the COVID-19 pandemic:  "I did not have the devices to work, so I was just sent home. . . . I didn't have access to a computer, to a phone, to anything to be able to work."  Doc. 123-17 at 13.

[16] Doumbia testified:

> Q:    Right.  I understand you were doing the best that you could you're saying from home, but were you concerned that things were going to slip through the cracks because you didn't have a computer and you were not at work?
> A:    Not really.  I was not.  It was not a concern to me.
> Q:    Okay.  Why not?
> A:    Because people were still working.  Others were there working.
> Q:    Who was there working?
> A:    The technician, the hub technician who are the primary receivers of the [over-detention] complaint, they were still working.  All of them, they are uniformed staff, so they were

8

*4.  Rivera's Transfer to Bellevue Hospital and Ultimate Death*

Rivera fell ill while still in custody, and on March 21, 2020, he was admitted to the prison ward at Bellevue Hospital ("Bellevue Prison Ward").  Doc. 112 ¶ 32.  Medical staff diagnosed Rivera with stage four esophageal cancer and COVID-19.  Doc. 112 ¶ 33.  Hospital records indicate that on March 23, 2020, Rivera asked the medical staff to notify his wife, Nancy Poux, "as soon as possible."  Doc. 123-20 at 7.  On March 29, 2020, the hospital records note that Poux wanted to visit Rivera, but that NYC DOC had a no visitation policy per the officer on duty.  *Id.* at 5.  Medical staff noted that they "[w]ill need to [follow up] with DOC to see if they will allow visitation if [patient] is at the [end of life]."  *Id.*

On April 2, 2020, Bellevue Prison Ward staff emailed NYC DOC staff to inquire about Rivera's detention status, noting that Rivera was "extremely ill" and appeared to have been "revoked and restored by parole on 2/27."  Doc. 124 ¶ 47; Doc. 123-21 at 6.  Later that day, an email thread between NYC DOC staff  indicates that Rivera still had an active warrant.  Doc. 123-21 at 5.  Those same emails indicate that one NYC DOC staff member was "looking into this with [State] DOCCS." [17]  *Id.*  At 10:56 a.m. on April 3, 2020, Bellevue Prison Ward staff again emailed NYC DOC staff indicating that Rivera

---

not out like us.

Q:    I see.  Only the non-uniformed staff went home?
A:    Yes.  And I believe the supervisors were required to go to the office twice a week if they wanted to.

Doc. 123-17 at 18.

[17]  At 7:57 p.m. on April 2, 2020, Carole James, the NYC DOC staff member tasked with corresponding with DOCCS, sent an email to an unknown recipient inquiring if Rivera "is a potential release."  Doc. 123-21 at 4.  Though Poux correctly points out that the direct recipient of the email is not apparent from the copy of the email produced in discovery, Docs. 125 ¶ 36; 123-21 at 4, it is apparent that State DOCCS staff member Timothy O'Brien was on an email thread with NYC DOC's request by 9:37 pm on April 2, 2020.  Doc. 123-21 at 3–4.

was "imminently dying, likely in the next 24 hours." Doc. 112 ¶ 38. About ten minutes later, NYC DOC staff emailed State DOCCS staff to discuss Rivera's parole status. Doc. 112 at ¶ 39.

Later on April 3, 2020, State DOCCS transmitted a warrant lift form to NYC DOC staff. Doc. 112 ¶ 40. NYC DOC officials then discharged Rivera from its custody.[18] Doc. 112 ¶ 41. The next day, at 3:40 a.m. on April 4, 2020, Rivera was pronounced dead. Doc. 124 ¶ 49.

### B. Procedural Background

Nancy Poux, as administrator of the estate of Raymond Rivera, filed this suit on November 1, 2022. Doc. 1. On October 27, 2023, Poux filed a first amended complaint ("FAC") against defendants City of New York, NYC DOC data analyst Ayouba Doumbia, New York City employees John and Jane Does 1–7 (together "City Defendants"), and State DOCCS parole officer Antoinette Douglas. Doc. 32. In the FAC, Poux alleges that Rivera was unlawfully over-detained for five weeks after the final parole revocation hearing. *Id.* ¶ 13. Poux alleges that this over-detention violated the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, and constituted false imprisonment under state law, and common law negligence. Doc. 32. ¶¶ 119–153.

On December 8, 2023, City Defendants filed their answer to the FAC, in part raising six affirmative defenses and asserting cross-claims against P.O. Douglas. Doc. 45. P.O. Douglas filed a motion to dismiss all claims against her on March 22, 2024.

---

[18] Poux's opposition states that, upon release from NYC DOC custody, Rivera was transferred to a "regular hospital room" at Bellevue Hospital, Doc. 126 at 15.

Doc. 63.  Prior to the resolution of P.O. Douglas' motion to dismiss, the parties engaged in settlement discussions.  *See* Doc. 102.  On April 14, 2025, the Court so-ordered City Defendants' stipulation of voluntary dismissal of all crossclaims asserted against P.O. Douglas with prejudice.  Doc. 103.  On July 23, 2025, the Court so-ordered the settlement between Poux and Douglas, which dismissed all of Poux's claims against Douglas with prejudice.  Doc. 118.[19]  Only the City Defendants remain.

On July 11, 2025, after the conclusion of discovery, City Defendants filed the instant motion for summary judgment as to all claims.  Doc. 110.  City Defendants argue that Poux's 42 U.S.C. § 1983 claims fail because the City Defendants were required to detain Rivera until the State DOCCS processed his release; Poux's § 1983 claims against the City of New York fail because Poux has failed to demonstrate *Monell* liability; Poux's § 1983 claims against Doumbia fail because Doumbia is entitled to qualified immunity; Poux's state false-imprisonment claim fails because it is time-barred and Rivera's detention by the NYC DOC was privileged; Poux's common law negligence claim fails because the NYC DOC was required to detain Rivera until the State DOCCS processed his release; and Defendants John and Jane Doe 1–7 should be dismissed because Poux has failed to identify them.  *See* Doc. 113.

---

[19] As a part of the settlement, Poux also agreed to withdraw her claims against Douglas in the related Court of Claims action, *Poux v. State*, Claim No. 141931.  Doc. 118.

11

II.    **NEW YORK'S PAROLE AND PAROLE REVOCATION
FRAMEWORK**

A.  **Legal and Regulatory Framework for Parole Supervision and Revocation**

Individuals on parole supervision are in State DOCCS' "legal custody."  N.Y.

Exec. Law § 259- i(2)(b).[20]  However, under New York's "bipartite [state/local]

corrections system . . . individuals ultimately subject to State [DOCCS] custody," may be

"confined in county jails."  *Ayers v. Coughlin,* 72 N.Y.2d 346, 349 (1988).

State DOCCS can issue a parole warrant which provides "sufficient authority" to

a municipality to detain the individual who would otherwise be on parole.  *See* N.Y.

Exec. Law § 259-i(3); *see also* N.Y. Exec. Law § 259-i(3)(a)(ii) (requiring that an officer,

"to whom such warrant shall be delivered is authorized and required to execute such

warrant by taking such person and having him detained").  In such circumstances, state

law requires that city officials detain the individual who allegedly violated parole while

the detention remains lawful.  *See* N.Y. Corr. Law § 500-c(4) ("The chief administrative

officer shall receive and safely keep in the county jail of his county each person lawfully

committed to his custody . . . Such officer shall not be held personally liable for receiving

or detaining any person under and in accordance with a commitment issued by a judicial

officer; nor shall he, without lawful authority, let any such person out of jail.").[21]  Parole

---

[20] N.Y. Exec. Law § 259- i, which establishes parole procedures, was amended in 2021.  *See* L. 2021, ch. 427, §§ 4–8 (Sept. 17, 2021).  City Defendants argue, and Poux does not contest, that the relevant statutory and regulatory provisions are those that were in effect in 2019 and early 2020, when the incidents at issue took place.  *See* Doc. 113 at 12.  Accordingly, this Opinion applies the law in effect at the time of Rivera's arrest and detention.

[21] N.Y. Exec. Law § 259-i outlines the parole revocation process and details a municipality's responsibilities in detaining an individual on parole.  *See, e.g.,* N.Y. Exec. Law § 259-i(3)(b) ("A person who shall have been taken into custody pursuant to this subdivision for violation of one or more conditions of presumptive release, parole, conditional release or post-release supervision shall, insofar as practicable, be incarcerated in the county or city in which the arrest occurred.").

warrants operate as a "hold" on the individual's parole which "authorizes the local municipality to detain an alleged parole violator until his final parole revocation hearing." *Uviles v. City of New York*, 130 F.4th 27, 31 (2d Cir. 2025) (summarizing New York law).

### B. Legal and Regulatory Framework for Final Parole Revocation Hearings and Lifting a Parole Warrant

New York state statutes detail the temporal and procedural requirements of a final parole revocation hearing. *See, e.g.,* N.Y. Exec. Law § 259-i(3)(f)(i) (requiring that final revocation hearings be scheduled within ninety days of an initial probable cause hearing); N.Y. Exec. Law § 259-i(3)(f)(ii) (providing that final revocation hearings be conducted by a presiding officer, who can be a hearing officer appointed by the Board of Parole); N.Y. Exec. Law § 259-i(3)(f)(iii) (providing that the individual who allegedly violated parole as well as their attorney shall be provided notice of the hearing). So do regulations issued by the Board of Parole. *See, e.g.,* N.Y. Comp. Codes R. & Regs. tit. 9, § 8005.17 (explaining the requirements for scheduling of the final revocation hearing and the alleged violator's representation); *id.* at § 8005.18 (listing the rights of someone accused of violating their parole at a final revocation hearing); *id.* at § 8005.19 (describing the conduct of the final revocation hearing).

Pursuant to state statute, even where a presiding officer determines that an individual violated a condition of parole, the officer may "direct" that the detained individual be "restored" to parole supervision. N.Y. Exec. Law § 259-i(3)(f)(x) ("For each violation so found, the presiding officer may (A) direct that the presumptive releasee, parolee, conditional releasee or person serving a period of post-release supervision be restored to supervision"). Similarly, New York regulations authorize the presiding officer to "restore" someone detained for violating parole, back to supervision.

*See* N.Y. Comp. Codes R. & Regs. tit. 9, § 8005.20(c) ("Upon a decision to revoke the violator's release and following consideration of mitigating and aggravating factors . . . , the presiding officer may:  (i) restore such violator to supervision.").[22]

However, neither state statutes nor state regulations detail the process by which a detained individual can have his parole warrant lifted and ultimately be released after a final parole revocation hearing in which his parole was revoked and restored.[23]

### C.  State DOCCS and NYC DOC Policy For Lifting a Parole Warrant

While state statutes and regulations are silent as to the process of lifting a parole warrant after an ALJ decision to restore an individual to supervision, the two agencies—State DOCCS and NYC DOC—have established a process for lifting parole warrants.  An internal State DOCCS directive titled "Community Supervision Revocation Process" details the administrative process that occurs after an ALJ's decision in a final parole revocation hearing but before a parole warrant is lifted.  Doc. 114-4.  The directive states that, "parole warrants do not expire.  They remain in force until cancelled by the

---

[22] Additional New York regulations impose similar requirements to the release of someone after their final parole revocation hearing; however, they do not detail the process by which a parole warrant is lifted or by which the detained individual is released.

Section § 8002.6 defines a "time assessment" as the "period of time which is fixed as a result of a final parole revocation hearing and which determines a date by which the parole violator will be eligible for re-release."  N.Y. Comp. Codes R. & Regs. tit. 9 § 8002.6.  The regulation further requires that, "[a]ll parole violators identified as eligible for re-release as defined by subdivision (a) of this section, will be released to parole supervision as soon as practicable after completion of the delinquent time assessment imposed irrespective of whether they are in State or local custody."  *Id.* at § 8002.6(c).

[23] State regulations are more explicit about the process of lifting a parole warrant in other circumstances. *See, e.g.,* N.Y. Comp. Codes R. & Regs. tit. 9, § 8004.2(g) (providing that after issuance of a parole warrant, but before a preliminary hearing has been conducted, a parole officer may report concerns about the warrant to a member of the Board of Parole, who can vacate the warrant); *id.* at § 8004.3(e)(1) (providing that, prior to a final revocation hearing, a parole warrant can be vacated directly by three members of a Board of Parole or an ALJ).

members of the Board of Parole or completion of the revocation process." Doc. 114-4 at

16. But when "a parole violator is ordered restored to supervision, the violator must be

released as soon as possible."[24] *Id.* at 14. The directive outlines a process by which the

DOCCS Parole Violation Unit notifies a DOCCS Senior Parole Officer about the ALJ

decision and the date that the individual will be released from custody. *Id.* Further, after

DOCCS Community Supervision prepares a "Certificate of Release" form, other DOCCS

staff will "sign and date the form, lift the warrant, instruct the parolee to report to the

assigned Parole Officer within 24 hours of release, and distribute copies as indicated."

*Id.* The directive reaffirms, "[DOCCS s]taff will not lift the warrant prior to receipt of

proper authorization. " *Id.* 15.

Deposition by NYC DOC staff indicates that it was NYC DOC policy to detain an

individual until their parole warrant was lifted by State DOCCS. In his deposition, NYC

DOC Captain Monastero testified that, until State DOCCS lifts a parole warrant, "the

official policy is that if the New York State Parole Warrant is active you have to hold that

person in custody." Doc. 114-13 at 80.[25] However, contrary to Captain Monastero's

---

[24] While the policy does not explicitly detail how long "as soon as possible" is, it does require additional justification by State DOCCS staff if someone is detained thirty days after the ALJ decision. *See* Doc. 114-14 at 14 ("If the violator has not been released within 30 days from the date of the ALJ Decision/Board Affirmation, Community Supervision must submit a supplementary report to the Board explaining the present status.").

[25] City Defendants note that NYC DOC Captain Monastero was not called as an organizational witness, but rather as an individual witness. Doc. 132 ¶ 24. Captain Monastero testified:

Q:     Thank you for the clarification, I am just going to ask you about the administrative law judge order. So if an administrative law judge issues a revoke and restore order for somebody in City custody, and the State Department of Correction fails to lift the parole warrant for a year, is it the Department's policy that they would keep that individual in custody for that additional year after the judge's order?

. . .

A.     The official policy is that if the New York State Parole Warrant is active you have to hold that person in custody.

testimony, a NYC DOC General Office Manual[26] produced during discovery outlined the ways in which a parole warrant may be lifted, noting that the NYC DOC Custody Management team may lift a warrant directly. Doc. 123-14 at 38 ("A parole warrant also may be lifted at the direction of Custody Management. A captain in Custody Management will stamp Parole's warrant lift authorization with an 'Authorization to Lift Parole Warrant' stamp and sign it and then fax the lift authorization to the [General Office] in your facility.").

### D. Complaints of Parole-Related Over-Detention

In his deposition, Doumbia was questioned about the number of parole-related 311 complaints he received. Though Doumbia initially said he was unsure, he agreed that he received "somewhere between zero and 20" complaints in a "typical week." Doc. 123-17 at 6.[27] For example, on the week ending on March 6, 2020, Doubmia received the following five complaints, which he forwarded to State DOCCS:

---

Q.    Does the policy require the Department to take action to investigate why there has been a failure to lift a parole warrant if the judge has ordered that person to be released?
A.    To my knowledge, it's not in the policy.

Doc. 114-13 at 80–81.

[26] The NYC DOC General Office Manual offered in the record is dated December 10, 2007. Doc. 123-14 at 2.

[27] Doumbia testified:

Q:    As of like March 18th, 2020, approximately how many complaints about parole per week would you receive and input into that spreadsheet?
A:    I can't remember that.
Q:    Can you approximate?
A:    I can't.
Q:    Is it more than a hundred per week, would you say?
A:    We never got that many, no.
Q:    You never got that many. Would you say it was more than 20 per week?
A:    No.
Q:    Okay.
A:    Less.
Q:    Less than 20 per week? What about more than ten per week?

- "R+R. 311 states:  Inmate has been revoked and restored back to parole on 02/18/2020. It has been longer than 5-10 days and no one has responded to his calls for release"
- "R+R. Inmate states:  I have been here since 2/20 but should have been released on 2/21 per judge Fengos. No one know [sic] why I am here. I have no bail or anything."
- "R+R. 311 states:  Inmate was arrested on 2/25/2020 she is waiting to be released, she saw the judge and has a sick mother at home."
- "Inmate states: I just beat my case and should have been home. I shouldn't be in prison, I called m[y] lawyer and he said he couldn't find me in the system."
- "R+R. Inmate states:  I was on parole violation and I went to court on Monday for a revoke and restored. I did the ninety days already. Parole was supposed to pick me up to be released."

Doc. 124 ¶ 40.[28]  Discovery revealed that in one year, the NYC DOC received 1,249 311 jail release complaints, over half of which were documented as "[p]arole [r]elated." Docs. 123-19; 132 ¶ 41.[29]

Both NYC DOC staff and State DOCCS staff testified that NYC DOC staff could inquire about a parolee's warrant status when they suspected the person should already be released.  State DOCCS bureau chief Shaw testified that the NYC DOC could "absolutely" notify State DOCCS when a person is ordered "revoked and restored" at a final parole revocation hearing and the NYC DOC never received a warrant lift.  Doc.

---

A:    It depends.
Q:    Okay, but less than 20.
A:    Yes.
Q:    In a typical week you would be getting somewhere between zero and 20 complaints about parole that you had to create a report about, is that fair to say?
A:    Yes.

Doc. 123-17 at 6.

[28] In the exhibits attached to Poux's opposition, she cited three sets of Doumbia's weekly emails to State DOCCS concerning parole-related 311 complaints, and each complaint has a "Resolution" field.  *See* Doc. 123-18.  In those emails, Doumbia references nine parole related complaints of over-detention, six of which explicitly allege that a person was being detained after an "R+R."  *Id.*  Of those six complaints due to over-detention after an "R+R," four of them have a resolution of "No Judge decision," and two of them have a resolution indicating that a "Release interview [is] scheduled for [the following] Monday."  *Id.* at 5.

[29] Defendants produced a spreadsheet of 311 complaints received by NYC DOC officials between April 3, 2019, and April 3, 2020.  Docs. 123-19; 132 ¶ 41.

123-9 at 27–28.[30]  NYC DOC Captain Monastero testified that if he received a 311

complaint concerning potential over-detention, he would independently "investigate . . .

in the interest of justice."  Doc. 123-8 at 16, 21.[31]

## III.    LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is only appropriate where the "materials in the record,

including depositions, documents, electronically stored information, affidavits or

---

[30] In her testimony, bureau chief Shaw referred to type of memorandum prepared after a final parole revocation hearing, like the one prepared by Parole Revocation Specialist Dandridge,  Doc. 114-6, by the form number "9015."  *See* Doc. 123-9 at 27.  Shaw testified:

> Q:    Now, in practice, if there is a person who's been ordered released now, today, and DOCCS -- the city is notified, have you seen occasions where the city will come back to the state DOCCS and say, We got this 9015 that this person had their final hearing but they're still here, what's going on?
> A:     Absolutely.  Yes.
> Q:    And what are the circumstances where that might happen?
> A:    Circumstances where the outcome may be a revoke or restore or a warrant lift and they have not received -- or a violation that's not sustained.
> Q:    I see.  And so sometimes the [C]ity DOC[] will come back to [S]tate DOCCS and say, we got the 9015, but this person is still in custody.  Can you give us an update on their status?
> A:    At times, yes.

Doc. 123-9 at 27.

[31] Specifically, Captain Monastero testified:

> Q:    What's the reason that you would undertake an investigation in response to [a 311 complaint of potential over-detention]?
> A:    It's not my job, but I'll go above and beyond in the interest of justice.  If this person should not [be] incarcerated -- even though the Department of Corrections is to keep them in custody -- if legally they are not supposed to be, I make sure I get the information to release this individual.
>
>                                    . . .
>
> Q:    Right, so I am referring back to that testimony.  I believe you testified you didn't feel it was your job to do these type of calls, but you felt it was in the interest of justice.  Is that correct?
> A:    To clarify, it is not necessarily my job title, but I do feel it is like the Department of Corrections' job to ensure that the people in our custody belong in custody, and people that should be at their liberty should be at their liberty.

Doc. 123-8 at 16, 21.

declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), 56(c)(1)(A). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id*.

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence

19

on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

"[S]ummary judgment should only be granted '[i]f after discovery, the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.'" *Hellstrom v. U.S. Department of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (alterations in original) (quoting *Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996)).

## IV.    DISCUSSION

City Defendants seek summary judgement with respect to each of Poux's claims. The court discusses each in turn.

### A.  42 U.S.C. § 1983 Claims

Poux brings 42 U.S.C. § 1983 claims against City Defendants, arguing that Rivera's continued detention for five weeks after his final parole revocation hearing constituted over-detention in violation of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.  See Doc. 32 ¶¶ 119–135.

Title 42 U.S.C. § 1983 "provides a private cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Boyland v. Wing*, 487 F. Supp. 2d 161, 167 (E.D.N.Y. 2007) (quoting 42 U.S.C. § 1983).  "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

### 1. Fourth and Fourteenth Amendment Violations

City Defendants assert that the New York City officials were "incapable of releasing" Rivera under applicable New York law, and therefore City Defendants are not liable for the Fourth and Fourteenth Amendment violations as a matter of law.  Doc. 113 at 11–18.

In arguing that they were unable to release Rivera, City Defendants point out that state law requires local officers to execute state parole warrants; provides that a parole warrant is "sufficient authority" to detain an individual; and states that city administrators cannot release detained individuals "without lawful authority."  *See* Doc. 113 at 13–14 (citing N.Y. Exec. Law § 259-i(3)(a) and N.Y. Corr. Law § 5000-c(4)).[32]

However, the statutes upon which they rely are insufficient to show that City Defendants were *prohibited* from seeking to have Rivera's parole warrant lifted or releasing him after ALJ Zrake's decision.  While the statutory regime includes provisions relating to issuing parole warrants, arresting individuals pursuant to such warrants, and detaining such individuals, as Poux correctly points out, the provisions are silent as to how a parole warrant is lifted after a final parole revocation hearing, and as to when release is mandated or authorized.  *See* Doc. 126 at 17.

Similarly, City Defendants rely on *Uviles v. City of New York*, 130 F.4th 27 (2d Cir. 2025), for the proposition that "when the City has received a parole warrant that has not been lifted by the State or otherwise vacated by a court order, it is not liable for the continued detention of a person pursuant to that warrant."  Doc. 113 at 15.  In *Uviles*, the

---

[32] City Defendants also argue that NYC DOC's own policies support finding that they were unable to release Rivera.  *See* Doc. 113 at 14.  However, NYC DOC policy does not determine what is prohibited or permitted under state law.

Second Circuit considered whether the City of New York violated the Fourth and Fourteenth Amendments by over-detaining the plaintiff for a parole violation. *Uviles*, 130 F.4th 27. The plaintiff in *Uviles* was under State DOCCS parole supervision when he was arrested for a separate charge. *Id.* at 30. Due to his arrest while on parole, State DOCCS issued a parole warrant for plaintiff, ordering the NYC DOC to detain him to "await action of the [State DOCCS] or a court of competent jurisdiction." *Id.* At the time of the plaintiff's detention,[33] state law required that State DOCCS provide a probable cause hearing within 15 days of the alleged parole violation. *See id.* at 29–30. However, the plaintiff never received the probable cause hearing and, even after posting bail, was detained for 17 days pursuant to the active parole warrant. *Id.*

In its analysis, the Second Circuit stated the issue of a parole warrant's validity "is a question of state law." *Id.* at 36. While N.Y. Exec. L. § 259-i "govern[ed] parole revocation procedures" including issuing a parole warrant, the Second Circuit noted that it "did not explain how a parole warrant may be lifted." *Id.* at 31. However, New York state regulations did explicitly identify the party with the power to vacate a parole warrant prior to a probable cause hearing: the parole board. *See id.* at 35 (citing N.Y. Comp. Codes R. & Regs. tit. 9, § 8004.2(g) ("At any time after the issuance of a warrant for retaking and temporary detention, and before the preliminary hearing or waiver thereof, an officer of the division assigned to field service and holding a title above senior

---

[33] Like this Court, the *Uviles* Court considered New York statutory and regulatory law in place at the time of Rivera's arrest and detention. *See Uviles v. City of New York*, 130 F.4th 27, at n.2 (2d Cir. 2025) ("Section 259-i was amended in 2021. The parties agree that the versions of the statute and regulations that were in force at the time of Uviles's 2018 detention govern this appeal. Accordingly, the citations to the statute and its accompanying regulations in this opinion reference those versions.") (citations omitted).

parole officer . . . may report in writing such circumstances concerning the warrant as are relevant to a board member who may then vacate the warrant.")).

As the regulations "authorized only a member of the board of parole to vacate a parole warrant," *id.* at 34, the Court concluded that "[s]tate law afforded the City no discretion but to honor the parole warrant until such invalidation occurred." *Id.* at 35. Therefore, the City of New York was not liable for the alleged over-detention of the plaintiff in *Uviles* because the plaintiff's "parole warrant remained facially valid—and the City was required to honor it—until it was lifted by the state board of parole or a court." *Id.* at 33.

As a factual matter, the instant case differs from *Uviles* because, here, a final parole revocation hearing *had* occurred and an ALJ had already issued a decision directing that Rivera be restored to supervision. *See* Doc. 112 ¶ 19. In *Uviles*, the issue was whether the plaintiff was entitled to release in the absence of the required probable cause hearing. *Uviles*, 130 F.4th at 30.

Additionally, City Defendants fail to establish that the Second Circuit's reasoning in *Uviles* compels the outcome of this case. City Defendants, like Second Circuit in *Uviles*, first look to N.Y. Exec. L. § 259-i for provisions relating to issuing a parole warrant and detaining an individual pursuant to that warrant. *See* Doc. 113 at 13–15. However, just as the *Uviles* Court observed, § 259-i does "not explain how a parole warrant is lifted" and an individual is released. *Uviles*, 130 F.4th at 35.

However, while the court in *Uviles* identified state law only allowing the board of parole to vacate a parole warrant prior to a probable cause hearing, City Defendants do not identify state law which prevents the City of New York from vacating a parole

23

warrant after an ALJ's decision to restore an individual to supervision. *Uviles* concerned the over-detention of a person on parole prior to a probable cause hearing, and the Second Circuit looked to state law concerning which parties had the authority to lift a parole warrant prior to a probable cause hearing. *Id.* at 34–35. Only after identifying a regulation which explicitly gave the parole board this authority, did the Second Circuit conclude that the City of New York possessed "no discretion" to lift the warrant itself or otherwise release the defendant. *Id.*[34] Here, City Defendants do not point to any state statute or regulation which identifies who can lift a parole warrant *after* a final revocation hearing has already occurred. Without providing a similar explicit limitation in state law, City Defendants have failed to show that the reasoning of *Uviles* controls the instant case.

For the reasons set forth above, the Court finds that City Defendants have failed to demonstrate that were not liable for the Fourth and Fourteenth Amendment violations as a matter of law. However, because the Court finds that Doumbia is entitled to qualified immunity and that the City of New York is not liable under *Monell*, City Defendants' motion summary judgement with respect to the Poux's 42 U.S.C. § 1983 claims for Fourth and Fourteenth Amendment violations is granted.

### 2. Eighth Amendment Violations

City Defendants assert that they are not liable for the alleged Eighth Amendment violations as a matter of law because Rivera's release was not required by state law and because they did not act with deliberate indifference. Docs. 113 at 18; 133 at 10. "A

---

[34] While the *Uviles* court also examined State DOCCS policy, it did so only to affirm State DOCCS understanding of state law provisions. S*ee Uviles*, 130 F.4th at 35 ("The text of Uviles's parole warrant described this allocation of legal authority. . . . The [State] DOCCS internal directive applied the same state law principles.").

plaintiff asserting an Eighth Amendment claim pursuant to 42 U.S.C. § 1983 must meet two requirements. First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the charged official must act with a sufficiently culpable state of mind." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1084 (2d Cir. 2021) (citing *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019)).

Where an incarcerated person's release is mandatory under state law, "unauthorized detention of just one day . . . qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment." *Hurd*, 984 F.3d, at 1085. As discussed above, neither state statute nor regulation details when a detained individual must be released after a "revoke and restore" decision by an ALJ; however, state courts have held that any delay in restoring an individual to supervision cannot be "unreasonable." *See, e.g., People ex rel. Ortiz v. Poole*, 11 Misc.3d 1064(A), at * 2 (N.Y. Sup. Ct. 2006) (holding that, after being ordered revoked and restored to supervision in a treatment center, "a parolee has a due process right to be transferred to [the in-patient treatment center] forthwith absent valid, enunciated reasons for not doing so.").

While City Defendants correctly observe that the cases Poux cites in her opposition involve detentions longer than the five-weeks Rivera was over-detained, *see, e.g., id.* (discussing detention between two and a half and five and a half months), the question of whether the delay in releasing Rivera was "reasonable" is a fact inquiry which a jury could reasonably find in favor of Poux.

City Defendants also argue that they were not deliberately indifferent as Rivera's detention was "reasonabl[e] . . . in light of the active State parole warrant for his continued detention," Doc. 113 at 18, and was "required by [state] law," Doc. 133 at 10.

25

Deliberate indifference "typically requires a state of mind that is the equivalent of criminal recklessness," meaning "only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead[s] to liability." *Hurd*, 984 F.3d at 1084 (citing *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019)).  While deliberate indifference requires more than negligence, it can include "culpable recklessness, meaning 'a conscious disregard of a substantial risk of serious harm . . .'" *Von Stein v. Pruyne*, No. 15-CV-7039 (CS), 2020 WL 3498431, at *21 (S.D.N.Y. June 29, 2020) (citation omitted).  Prison officials can be found to be "deliberately indifferent to their own clerical errors on the basis of their refusals to investigate well-founded complaints regarding these errors." *Hurd*, 984 F.3d, at 1084–85.  However, there is no Eighth Amendment liability for over-detention resulting from "processing or other administrative delays, as opposed to the deliberate indifference." *Id.* at 1086.  Additionally, there must be a "causal connection between the official's response to the problem and the infliction of the unjustified detention . . ." *Id.* (citing *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989)).

Poux argues that City Defendants "disregard of glaring evidence of [Rivera's] overdetention constitutes deliberate indifference." Doc. 126 at 28.  She argues that City Defendants "were on notice" of Rivera's over-detention based on:  (1) parole revocation specialist Dandridge's February 27, 2020 memorandum issued immediately after Rivera's final revocation hearing, which was addressed to NYC DOC; (2) parole officer Nwakanma's March 11, 2020 call to Riker's Island to verify Rivera's location; and (3) Rivera's 311 complaint, which NYC DOC officer Ho testified he personally provided to defendant Doumbia.  Doc. 126 at 27–28.

26

The February 27, 2020 memorandum and the March 11, 2020 call are insufficient to show that NYC DOC staff had the requisite knowledge of Rivera's over-detention for their inaction to constitute deliberate indifference. *See D'Angelo v. Annucci*, 2017 WL 6514692, at *10 (S.D.N.Y. Dec. 19, 2017) (dismissing an Eighth Amendment over-detention claim because plaintiffs failed to allege that the defendant had personal knowledge of the over-detention). At the time the memorandum was circulated to NYC DOC, Rivera had not yet been over-detained. *See* Doc. 114-6 at 6. ALJ Zrake's final decision restoring Rivera was issued on February 28, 2020, Doc. 124 ¶ 19, and as discussed above, Rivera's release would not have been immediate but would occur in a reasonable timeframe thereafter.

Further, the evidence concerning the March 11, 2020 call between parole officer Nwakanma and NYC DOC staff is also insufficient to show that NYC DOC staff knew of Rivera's over-detention at that time. According to the DOCCS Chrono Report, Rivera was reassigned to parole office Nwakanma, and Nwakanma called NYC DOC staff after being unable to locate Rivera in the NYC DOC lookup-system. Doc. 123-4 at 2–3. According to the DOCCS Chrono Report, NYC DOC staff verified that Rivera was still in detention, but the report does not indicate that Nwakanma or the NYC DOC staff knew that Rivera was being unlawfully over-detained. *See id.* Poux provides no additional evidence indicating that, from the time of this call, NYC DOC staff should have known Rivera was over-detained.

However, whether Doumbia's inaction constituted deliberate indifference is a genuine issue of material fact. There is a factual dispute as to whether Doumbia received Ho's information prior to leaving the office due to COVID-19. *See* Docs. 112 ¶ 24–25;

27

114-9 at 53.  For purposes of deciding this motion, the Court finds that there is evidence in the record that Doumbia did receive Ho's notification of Rivera's over-detention complaint.  Doc. 114-9 at 53.  Whether Doumbia's failure to send notice of the complaint to State DOCCS constituted mere negligence or deliberate indifference under the circumstances is a factual inquiry that a reasonable jury could find for Poux.  *See, e.g., Von Stein v. Pruyne*, No. 15-CV-7039 (CS), 2020 WL 3498431, at *21 (S.D.N.Y. June 29, 2020) (finding that plaintiffs introduced sufficient evidence that defendants acted with deliberate indifference to plaintiff's over-detention where the defendants received plaintiff's complaints of over-detention, provided plaintiff a response to those complaints, but ultimately did not assist in resolving plaintiff's over-detention); *see also Rodriguez v. City of New York*, 623 F. Supp. 3d 225, 253–54 (S.D.N.Y. 2022) (stating that defendants' failure to act after learning of plaintiff's over-detention may constitute deliberate indifference depending on the facts, and therefore refusing to grant defendants' motion to dismiss the Eighth Amendment over-detention claim).

Finally, as detailed above, City Defendants have failed to show that state law prohibited them from seeking to lift Rivera's parole warrant or releasing him after ALJ Zrake's decision to revoke and restore Rivera to supervision.

For the reasons set forth above, the Court finds that City Defendants have failed to demonstrate that they were not liable for the Eighth Amendment violation as a matter of law.  However, because the Court finds that Doumbia is entitled to qualified immunity and that the City of New York is not liable under *Monell*, City Defendants' motion summary judgement with respect to the Poux's 42 U.S.C. § 1983 claims for Eighth Amendment violations is granted.

28

### 3. *Monell Liability of the City of New York*

Poux argues that the City of New York has an "unconstitutional policy and practice of . . . ignoring overdetention complaints from incarcerated individuals until State DOCCS lifts a parolee's warrant, even after a court has ordered release." Doc. 126 at 23. City Defendants argue that the City of New York is not subject to *Monell* liability on this basis because (1) Poux has adduced "no factual evidence" of a policy or custom of over-detaining individuals on parole outside of the requirements of New York law and (2) City Defendants "were required to detain Rivera while his parole warrant remained unlifted pursuant to [s]tate law." Doc 113 at 18; 133 at 10.

As detailed above, City Defendants have failed to demonstrate that state law prohibited them from lifting Rivera's warrant or releasing him after ALJ Zrake decision to revoke and restore him to supervision. Therefore, the Court only examines whether Poux has produced sufficient evidence to demonstrate that the City of New York had a policy or practice of ignoring overdetention complaints and "detaining incarcerated people such [as] Mr. Rivera in custody beyond the date they are lawfully entitled to release." Doc. 32 ¶ 122; Doc. 126 at 23.

According to *Monell v. Department of Social Services of the City of New York*, a municipality is liable under § 1983 if it, "under color of some official policy, 'causes' an employee to violate another's constitutional rights." 436 U.S. 658, 691–92 (1978). "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotations omitted).

To demonstrate that the City of New York has an unconstitutional policy of ignoring over-detention complaints until State DOCCS lifts a parole warrant, Poux points to Captain Monastero's testimony concerning NYC DOC policy, Doumbia's testimony, emails concerning 311 over-detention complaints, and spreadsheet data providing the number of such complaints over one year.  Docs. 114-13 at 80–81, 123-17 at 6, 123-18, 123-19.  First, in his deposition, Captain Monastero testified that the NYC DOC's "official policy is that if the New York State Parole Warrant is active you have to hold that person in custody."  Doc. 114-13 at 80–81.  Though this was not a 30(b)(6) deposition, taking the facts in the light most favorable to Poux and assuming this was NYC DOC policy, such a policy is not unconstitutional on its face.  However, "*Monell* liability can be established '[w]here a [municipality's] official policy is constitutional, but [it] causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy . . . .'" *Torcivia v. Suffolk County*, 17 F.4th 342, 364 (2d Cir. 2021) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004)) (alterations in original).

Looking at the evidence of over-detention complaints, Poux has failed to demonstrate that this policy was applied in an unconstitutional fashion.  Doumbia testified that, in a typical week, he received "between zero and 20" 311 complaints concerning detention of individuals on parole after a final parole revocation hearing.  Doc. 123 at 6.  Further, several of Doumbia's weekly summary emails showcase that on multiple occasions these 311 complaints alleged that individuals on parole had been revoked and restored by an ALJ but were still detained.  *See* Doc. 123-18 at 5, 10, 13.  In these emails, of the six over-detention complaints that specifically mention a "R+R," four

of them were resolved as no ALJ decision had been rendered yet, and two of them had been resolved as a release interview had been scheduled for the following week. *Id.* at 5. Further, a spreadsheet produced in discovery confirms that between April 3, 2019, and April 3, 2020, the NYC DOC received 1,249 "jail-release" 311 complaints, over half of which were "[p]arole [r]elated." Doc. 123-19; 132 ¶ 41.

While this evidence demonstrates that NYC DOC received many parole-related over-detention complaints, some of which involved allegations that individuals were detained after an ALJ decision to be restored to supervision, the existence of these complaints alone is insufficient to demonstrate that a constitutional injury occurred. *See Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 409 (E.D.N.Y. 2011) (grating summary judgement where "[p]laintiffs seem to proceed on the assumption that if a complaint, whether administrative or by way of a civil action, is filed against an officer, it follows *ipso facto* that he is guilty of a constitutional violation, a proposition I cannot accept."); *see also Hall v. Westchester County*, No. 18-CV-8114 (NSR), 2021 WL 795165, at n.1 (S.D.N.Y. Mar. 1, 2021) ("[T]he existence of other lawsuits in and of itself is insufficient to confer *Monell* liability.") (internal citations omitted).

Further, while Doumbia's emails suggest that, of the six complaints involving an individual who had been revoked and restored, four were "resolved" by determining an ALJ decision had not yet issued a decision and two by noting that an upcoming release interview was scheduled, this evidence alone is not sufficient to allow a reasonable jury to find that unconstitutional detentions occurred. Accordingly, City Defendants' motion

for summary judgement with respect to the City of New York's *Monell* liability is

granted.[35]

### 4. *Qualified Immunity for Doumbia*

City Defendants argue that Doumbia is entitled to qualified immunity with respect

to all of Poux's constitutional claims. Docs. 113 at 21–24. A government official sued in

his individual capacity is entitled to qualified immunity (1) if the conduct attributed to

him was not prohibited by federal law; (2) where the conduct was so prohibited, if the

plaintiff's right not to be subjected to such conduct by the defendant was not clearly

established at the time it occurred; or (3) if the defendant's action was objectively legally

reasonable in light of the legal rules that were clearly established at the time it was taken.

*Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010).

In determining if a particular right was clearly established, courts in the Second

Circuit "look to whether (1) it was defined with reasonable clarity, (2) the Supreme Court

or the Second Circuit has confirmed the existence of the right, and (3) a reasonable

defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*,

642 F.3d 334, 345 (2d Cir. 2011) (citing *Young v. County of Fulton*, 160 F.3d 899, 903

(2d Cir. 1998)). "Absent controlling authority, a plaintiff must show 'a robust consensus

of cases of persuasive authority.'" *Radwan v. Manuel*, 55 F.4th 101, 114 (2d Cir. 2022)

(internal citation omitted).

---

[35] To the extent that Poux argues that it was the City of New York's policy to ignore over-detention complaints, that is refuted by the fact that generally every week, Doumbia sent State DOCCS a list of all over-detention complaints.

"[W]hen a qualified immunity defense is asserted, a court should consider the specific scope and nature of a defendant's qualified immunity claim.  In particular, a determination of whether the right at issue was 'clearly established' must be undertaken 'in light of the specific context of the case, not as a broad general proposition.'"  *Phillips v. County of Orange*, 894 F.Supp.2d 345, 386 (S.D.N.Y. 2012) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  In other words, the Court must ask whether the right at issue was established "in a particularized sense so that the contours of the right [were] clear to a reasonable official."  *Reichle v. Howards*, 566 U.S. 658, 661 (2012) (internal quotation marks omitted).  Although a case directly on point is not required to demonstrate that a right is clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Fabrikant v. French,* 691 F.3d 193, 213 (2d Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 2074 (2011)).

City Defendants argue that Doumbia is entitled to qualified immunity with respect to Poux's constitutional claims because Rivera had no clearly established constitutional right to have his over-detention complaint forwarded to State DOCCS.  *See* Doc. 113 at 22–23 ("Defendants are not aware of any case clearly establishing a right to have a prison complaint about overdetention forwarded to [State] DOCCS, whose own ALJ had issued—and apparently circulated to relevant stakeholders at the [State] DOCCS.").  Meanwhile, Poux argues that the right at issue is whether Rivera had a right to be released after he was ordered released.  Doc. 126 at 29 (arguing that, "a reasonable person would have known that jailing Mr. Rivera after he was ordered released was unconstitutional.").

The right at issue is whether an individual who is detained due to a parole revocation has a right to be released after an ALJ decision restores him to supervision such that a reasonable NYC DOC employee would know that a failure to investigate an over-detention complaint would result in a constitutional injury. *See Hurd*, 984 F.3d at 1089–90 (2d Cir. 2021) (distinguishing between the clearly-established principle that no authority can detain a person "past the expiration of the sentence imposed on them," and the then not-clearly-established right to be released after a "mandatory conditional release date that occurs prior to the expiration of the maximum sentence.")

However, Poux's cited cases fail to demonstrate that this right was clearly established at the time of Rivera's detention.  The cited cases establish that:  (1) an individual has the clearly established right to be released from detention after the expiration of his sentence, *see, e.g., Brown v. Coughlin*, 704 F.Supp. 41, 45 (S.D.N.Y. 1989) ("Failure to act while [plaintiff] remained imprisoned beyond his release date is not conduct protected by qualified immunity."); *Rivera v. Carroll*, No. 07 Civ. 7847 (RJS), 2009 WL 2365240, at *5 (S.D.N.Y. Aug. 3, 2009) (noting that if state defendants did indeed know about a miscalculation of plaintiff's release date and did nothing to fix the issue, "it cannot be said that reasonable officials would believe it permissible to allow Plaintiff to remain in custody beyond his release date."); (2) that an individual has the clearly established right to be released after the grant of a writ of *habeas corpus*, *see Rodriguez v. City of New York,* 623 F. Supp. 3d 225, 255 (S.D.N.Y. 2022) (specifically noting that, when a writ of *habeas corpus* has been issued, "no reasonable official would believe it was permissible to simply do nothing and allow a person to remain in custody"); and (3) an individual has the clearly established right not to have their prison

34

sentence extended due to an alleged parole violation without a violation hearing, *Calhoun v. New York State Division of Parole Officers*, 999 F.2d 647, 655 (2d Cir. 1993).

As detailed above, the Court finds that a failure to release an individual from detention after an ALJ decides they should be restored to supervision within a reasonable time can constitute a constitutional injury.  This finding is a natural extension of the caselaw cited by Poux.  *See Brown v. Coughlin*, 704 F.Supp. 41 (relating to release after the expiration of a sentence); *Rodriguez v. City of New York,* 623 F. Supp. 3d 225 (relating to release after a writ of *habeas corpus*); *Hurd*, 984 F.3d at 1089–90 (2d Cir. 2021) (relating to release after expiration of a "mandatory conditional release.").  Further, State DOCCS's own policy and testimony suggests that, at the time, individuals who were revoked and restored by an ALJ should have been released "as soon as possible," not the five weeks Rivera was over-detained.  *See* Docs. 114-4 at 14.

However, as detailed above, Poux fails to demonstrate that the right of an individual on parole to be released within a reasonable time after an ALJ's decision to revoke and restore them to supervision was clearly established by caselaw at the time of Rivera's detention such that a reasonable NYC DOC employee would have known that failing to investigate an over-detention complaint would result in an unconstitutional injury.  Accordingly, defendant Doumbia is entitled to qualified immunity on each of Poux's constitutional claims.

### B.  Remaining State Law Claims

Federal district courts have supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28

U.S.C. § 1367(a); *see also Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 27 (2025) (stating that, under § 1367(a), as under *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), supplemental jurisdiction applies to state-law claims that arise "from the same facts" as a federal-law claim over which a court has original jurisdiction).  The doctrine of supplemental jurisdiction is traditionally "a doctrine of discretion, not of plaintiff's right."  *Kolari v. N.Y.-Presbyterian Hospital*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *United Mine Workers*, 383 U.S. at 726 (1966)).  Subsection (c) of § 1367 enumerates circumstances in which a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a)[.]" 28 U.S.C. § 1367(c).  One such circumstance is where, as here, "the district court has dismissed all claims over which it has original jurisdiction." *Id.* at § 1367(c)(3).  Having granted City Defendants' motion for summary judgment with respect to all of Plaintiffs' federal claims, the Court declines to adjudicate Plaintiffs' related state law claims and dismisses them without prejudice.

### C.  Dismissal of John and Jane Does 1–7

City Defendants argue that summary judgment should be granted to Defendants John and Jane Does 1–7, as Poux has failed to identify these defendants over the course of discovery.  Doc. 113 at 24.  Poux does not object.  Doc. 126 at n.9.  Accordingly, City Defendants' motion for summary judgement with respect to all claims against John and Jane Does 1–7 is granted.

## V.    CONCLUSION

For the reasons set forth above, City Defendants' motion for summary judgement is granted.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 110, and close the case.

It is SO ORDERED.

Dated:    March 31, 2026
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.